# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

**SHARON TAYLOR,** *et al.,*

      **Plaintiffs,**

**v.**

**ACXIOM.,** *et al.,*

      **Defendants.**

§
§
§
§
§
§
§

**CAUSE NOS. 2:07-cv-00001, 2:07-cv-00013, 2:07-cv-00014, 2:07-cv-00017, 2:07-cv-00018, 2:07-cv-00410**

**JUDGE: DONALD WALTER**

**RESPONSE TO DEFENDANTS CONSOLIDATED MOTION TO DISMISS ON COMMON ISSUES**

Dockets.Justia.com

# TABLE OF CONTENTS

I.    Preliminary Statement.................................................................1

II.    Arguments & Authorities.........................................................3

A.  The Plain Language of the DPPA Prohibits Companies
from Obtaining 'Motor Vehicle Records' Without a Specific
Permissible Purpose for Each Record Obtained............................3

B.  The DPPA Regulates Individual Pieces of "Personal
Information " Contained in Individual "Motor Vehicle Records".......3-6

C.  *Russell v. Choicepoint* Does NOT Support Convenience
Purchasers Arguments...................................................7-14

D.  The *Russell* Court Incorrectly Interpreted the DPPA
As To Resellers.........................................................14-20

E,  Even if *Russell* is Correct, The State of Texas Has No
Resale Authorization Process...........................................20-23

F.  Plaintiffs Have Standing to Assert Their Claims.................23-25

# TABLE OF AUTHORITIES

## CASES

*Air Brake Systems, Inc. v. Mineta*
    357 F.3d 632, 635 (6th Cir. 2004)................................................19

*Am. Express Co. v. United States*
    262 F.3d 1376, 1382 (Fed.Cir.2001)...........................................19

*Brown v. Gardner*
    513 U.S. 115, 118 (1994)...........................................................18

*Chevron U.S.A. Inc. v. Natural Resources Defense Counsel*
    467 U.S. 837 (1984)..................................................................19

*Christensen v. Harris County*
    529 U.S. 576, 587 (2000)...........................................................19

*Davis v. Michigan Dept. of Treasury*
    489 U.S. 803, 809 (1989)...........................................................18

*Federal Election Comm. v. Akins*
    524 U.S. 11, 20-22 (1998)..........................................................24

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*
    529 U.S. 120, 133 (2000)...........................................................18

*FTC v. Ivandel Brothers, Inc.*
    359 U.S. 385, 389 (1959)...........................................................18

*Gustafson v. Alloyd Co.*
    513 U.S. 561, 569 (1995)...........................................................18

*Himmermann v. First Union Mortgage Corp.*
    305 F.3d 1257, 1262 (11th Cir. 2002)........................................19

*Kehoe v. Fidelity Federal Bank & Trust*
    421 F.3d 1209 (11th Cir. 2005).................................................24

*Linda R.S. v. Richard D.*
    410 U.S. 614.617 n. 3 (1973).....................................................24

*Locate.Pius.Com Inc. v. Iowa D.O.T.*
    650 N.W.2d 609,616 (Iowa 2002).............................................17

*Lujan v. Defenders of Wildlife*
    504 U.S. 555, 560 (1992)...........................................................23,24

*Moore v. Apfel*
    216 F.3d 864, 869 & n. 2 (9th Cir. 2000)..................................18

*Parus v. Cator*
    2005 WL 2240955, at 5 (W.D.Wis. 2005)...............................8,23

*Russell v. Choicepoint Services, Inc.*
    302 F.Supp.2d 654, 657 (E.D. La. 2004)................................7,25

*Russell v. Choicepoint Services, Inc.*
    300 F.Supp.2d 450, 455 (E.D. La. 2004)................................8,21

*United States v. Navarro*
    160 F.3d 1254, 1257 n. 4 (9th Cir. 1998).................................19

*Worth v. Seldin*
    422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)...................24

## STATUTES AND RULES

18 USCA § 2721(a)...............................................................................4,5

18 USCA § 2721(c)............................................................................4,5,21

18 USCA § 2721 to 2725, 183 A.L.R. Fed. 37 (2007)...........................6,7

18 USCA § 2722.....................................................................................9

18 USCA § 2724...................................................................................7,8

139 Cong. Rec. S15765 (1993)..............................................................23

## PUBLICATIONS

*Webster's Third New International Dictionary*...........................................15

*The American Heritage Dictionary*.........................................................15

## RESPONSE TO DEFENDANTS CONSOLIDATED
## MOTION TO DISMISS ON COMMON ISSUES

Plaintiffs, by and through their undersigned counsel, hereby file their Response to Defendants' Consolidated Motion to Dismiss on Common Issues (doc. 72), and in support thereof,[1] state:

## I.

## PRELIMINARY STATEMENT

With the exception of the five Defendants who are attempting to form a national settlement class in Southern District of Florida based on the same allegations raised here (and involving a $25,000,000 payout and comprehensive injunctive relief), all Defendants challenge Plaintiffs' right to redress Defendants' repeated and systematic violations of their rights under the Drivers' Privacy Protection Act ("DPPA"). In doing so, Defendants misconstrued the DPPA's provisions, the policies behind its enactment, and its legislative history. The language of the DPPA is clear, unambiguous, and specifically prohibit Defendants' actions.

Despite their vastly different business models, each of the Defendants can be broken into two distinct categories. First, many Defendants admittedly purchased "motor vehicle records" purely for resale of those records to others (hereinafter "the Resellers"). Resellers do not use the subject drivers license records except to the extent that selling "motor vehicle records" constitutes use to derive profits. As is demonstrated below, however, intended resale is not a proper purpose under the DPPA to obtain "motor vehicle records."

---

[1] As with Defendants, Plaintiffs also rely on all arguments previously made in response to Defendants' numerous Motions to Dismiss. Plaintiffs have attached an example of one of these response as Exhibit 1. Plaintiffs, however, incorporate by reference all arguments made in these various responses.

Second, the remaining Defendants appear to assert a proper purpose for obtaining *some* individuals' "motor vehicle records," but do not have a proper purpose for obtaining the Plaintiffs'[2] "motor vehicle records" or the vast majority of the approximately twenty million members of the putative class. For the sake of clarity, Plaintiffs will refer to these Defendants as the "Convenience Purchasers."

Convenience Purchasers obtained Plaintiffs'[2] "personal information" for an impermissible purpose – to save themselves time and/or money by not having to go back to the State of Texas each time they needed additional information. Convenience Purchasers chose to avoid the inconvenience of having to go to the State each time they require additional customers' information (as many other entities do on a regular basis.). Convenience Purchasers' also "continued to use Plaintiffs' personal information by maintaining a database containing the above-referenced Plaintiffs' personal information as part and parcel to the conduct of [their] ordinary business activities and as a business resource."[3] These choices made by Convenience Purchasers subject them to liability under the DPPA, as they have obtained Plaintiffs' individual "motor vehicle records" for a purpose not permitted under the Act.

---

[2] For convenience, Plaintiffs will simply refer to Plaintiffs throughout this argument. In their Statement recently filed with the Court, Plaintiffs delineated specifically which Plaintiffs contend which Defendant improperly obtained each of their data. As this brief is global in nature, it is easier and clearer for the reader to simply refer to Plaintiffs as a whole, rather than attempt to re-delineate the particular parties for each Defendant. Also, as noted in Plaintiffs' Statement, "[w]hile the remaining named Plaintiffs are aware of relationships between themselves and this particular defendant, they are in no way dismissing their claims that this defendant had an impermissible purpose for obtaining their particular "personal information" at the time that the data was obtained. The named Plaintiffs not listed in this paragraph reserve the right to explore, through discovery, whether this Defendant indeed had a permissible purpose for obtaining their particular data.
[3] *See* Document 62.

In their Consolidated Motion to Dismiss ("Motion"), Defendants contend that Plaintiffs fail to state a claim against either the Convenience Purchasers or the Resellers. Plaintiffs address each of those arguments below.

## II.

## ARGUMENTS & AUTHORITIES

### A. The Plain Language of the DPPA Prohibits Obtaining 'Motor Vehicle Records' Without a Specific Permissible Purpose for Each Record Obtained.

Convenience Purchasers' entire argument essentially boils down to a single premise: they had a proper purpose for obtaining *some* individual pieces of "personal information" from Texas' "motor vehicle records." Based on this, Convenience Purchasers contend that the DPPA allows them to obtain *all* of the millions of individual pieces of "personal information" from the millions of "motor vehicle records" contained in the State of Texas database. Presumably, if Convenience Purchasers had only needed a single piece of "personal information" contained in a single "motor vehicle record" they would be justified in purchasing millions of other persons' "personal information." The DPPA, however, regulates individual pieces of "personal information" and does not allow entities to purchase information for which they do not have a corresponding use.

### B. The DPPA Regulates Individual Pieces of "Personal Information" Contained in Individual "Motor Vehicle Records."

The first step in analyzing a statute is to examine what it regulates. The DPPA regulates individuals' "personal information" and individuals' "motor vehicle records." The very first provision of the DPPA states that "State departments of motor vehicles . . . shall not knowingly disclose . . .

> (1) *personal information . . . about any individual* obtained by
> the department in connection with *a motor vehicle record.*

> (2) *highly restricted personal information . . . about any individual* obtained by the department in connection with *a motor vehicle record.*[4]

The DPPA proceeds to define "motor vehicle records" as follows:

> (1) *"motor vehicle record"* means any record that pertains to *a motor vehicle operator's permit*

"Personal information" is also defined by the DPPA as follows.

> (3) *"personal information"* means information that identifies *an individual*, including an *individual's photograph*, social security number, . . . .[5]

Notice that every highlighted term is in the singular. Congress never refers to "motor vehicles records;" it is invariably *a* **motor vehicle record.** Congress does not use the terms individuals or drivers in the plural. The DPPA invariably refers to *an individual* or *a driver*. Perhaps most telling, are the sections of the DPPA which imposes civil liability for improper obtainment of a "motor vehicle record."

> **Cause of action.**--A person who knowingly obtains, discloses or uses personal information, from *a motor vehicle record*, for a purpose not permitted under this chapter shall be liable *to the individual* to whom the information pertains, who may bring a civil action in a United States district court.[6]

The above language clearly demonstrates that Congress sought to regulate individual "motor vehicle records" and the private, "personal information" contained within them.

In fact, there is only one provision of the DPPA which deals with bulk distribution and that is Section 2721(b)(12). Section 2721(b)(12) provides that

---

[4] 18 USCA § 2721(a)(emphasis added).
[5] 18 USCA § 2725 (emphasis added).
[6] 18 USCA § 2724 (emphasis added).

4

"'Personal information' . . . *may be disclosed* . . . [f]or bulk distribution for surveys, marketing or solicitations *if the State has obtained the express consent of the person to whom such personal information pertains.*" (emphasis added). Section 2721(b)(12) is the only provision of the DPPA which *allows* a state to distribute its entire database. Nothing else in the Act refers to bulk distribution. Bulk distribution or obtainment in bulk is simply not contemplated by the DPPA unless the state has obtained the express consent of each individual whose information is sold.

The Contract entered between Convenience Purchasers and the State of Texas specifically recognizes that bulk distribution is only allowed if that state has express consent, cites the DPPA as authority for this proposition, and further states that "the Texas State Legislature has refrained from enacting any express consent system for use in Texas." [7]   Interestingly, the Contract further provides that "*Texas law* requires each prospective purchaser of records in bulk, before receiving any records, to execute a written purchase agreement."[8]   The Contract is silent as to whether the DPPA allows sales of records in bulk and, in fact, requires the purchaser "to indemnify and save harmless the State of Texas and DPS . . . with respect to any claim asserted against them under the [DPPA].

In other words, the State of Texas insists that Convenience Purchasers bear the risk that their actions are in violation of the DPPA. This is hardly a determination by the State of Texas that its actions are legal, as has been suggested by Convenience

---

[7] An example of one of these contracts is attached hereto as Exhibit 2. ("WHEREAS, state and federal law, including the federal Driver Privacy Protection Act of 1994, as amended by PL 106-69 (18 USC §2721, as amended), presently prohibits state motor vehicle agencies from selling personal information in bulk for purposes of marketing, solicitations, and certain surveys unless a state has first obtained express consent from each individual about whom listed personal information pertains."). Numerous Defendants have made reference to these contracts as they were referenced in Plaintiffs' Complaints.
[8] *See id.* (emphasis added).

Purchasers. It is merely a sale of valuable information and an attempt to shift any liability from this illegal purchase to the purchaser. Incidentally, this is exactly the type of profiteering by the States that Congress sought to curb.[9]

Thus, it is clear that the DPPA regulates information at the individual level and only allows bulk distribution in a very limited context, which is not present in this case. It is also clear that Congress was concerned with the fact that State DMVs were profiting with individuals' private information. Contrary to whatever creative statutory arguments Convenience Purchasers attempt to make about the "overarching" structure of the DPPA, there is absolutely no support for the proposition that the DPPA expressly allows the bulk sale of individuals' "personal information" contained in individual's "motor vehicle records." Convenience Purchasers are only allowed to purchase the individual motor vehicle records for which they have a proper purpose. These purposes are the uses described in the laundry list of uses contained in Section 2721(b). Thus, the DPPA specifically requires a corresponding use for each particular piece of information obtained.

---

[9] Deborah F. Buckman, Annotation, *Validity, Construction, and Application of Federal Driver's Privacy Protection Act*, 18 U.S.C.A. §§ 2721 to 2725, 183 A.L.R. FED. 37 (2007)("Congress was also concerned about the common practice by many states of selling information in motor vehicle records to businesses, marketers, and individuals. Many state motor vehicle departments were in fact generating significant revenues by such sales.");145 CONG. REC. S11862-01 (1999) (statement of Sen. Shelby)("I believe that the general public would be as shocked as my colleagues in the Senate if they learned that States were running a business with the personal information from motor vehicle records.")("My concern is that private information is too available. The proliferation of information over the Internet makes it easy and cheap for almost anyone to access very personal information."); *Reno v. Condon*, 528 U.S. 141, 143 (2000) ("Congress found that many States, in turn, sell this personal information to individuals and businesses.") (citing 139 Cong. Rec. 29466, 29468, 29469 (1993); 140 Cong. Rec. 7929 (1994) (remarks of Rep. Goss)).("These sales generate significant revenues for the States." *Id.* (citing *Travis v. Reno*, 163 F.3d 1000, 1002 (C.A.7 1998) (noting that the Wisconsin Department of Transportation receives approximately $8 Million each year from the sale of motor vehicle information)).

**C.** **_Russell v. Choicepoint_ Does NOT Support Convenience Purchasers Arguments.**

Both Convenience Purchasers and Resellers rely heavily on *Russell v. Chioicepoint.* *Russell*, however, provides absolutely no support for Convenience Purchasers arguments. According to Convenience Purchases, *Russell* stands for the proposition that for *any* DPPA claim, a plaintiff must allege an improper use in order to maintain an action for improper obtainment. Initially, it must be noted that this interpretation of *Russell* would completely gut the DPPA of any improper obtainment claim. There would be no point of the DPPA separately outlining an obtainment claim if it always required a corresponding impermissible use. The DPPA would only delineate an improper use claim. But there is it is, a prohibition on improper obtainment claim.[10]

The more immediate problem with Convenience Purchasers' argument, however, is that *Russell* does not hold that an improper obtainment .claim always requires a corresponding impermissible use. The only serious allegation involved in *Russell* was the claim that the defendants had obtained drivers license records for the impermissible purpose of resale.[11] The *Russell* court was examining section 2721(c) of the DPPA (which is not at issue with Convenience Purchasers) and attempting to determine whether resale was a permissible purpose for obtaining "motor vehicle records." Section 2721(c) provides that "[a]n authorized recipient of personal information . . . may resell or redisclose the information only for a use permitted under subsection (b)." As will be

---

[10] 18 U.S.C. 2724 ("A person who knowingly *obtains*, discloses *or* uses personal information . . . shall be liable").

[11] *Russell v. Choicepoint Services, Inc.* 302 F.Supp.2d 654, 657 (E.D. La. 2004) ("The Complaint alleges that defendant illegally obtained plaintiffs' and other proposed class members' personal information from the Louisiana Department of Motor Vehicles ("DMV") for the impermissible purpose of disclosure and distribution by resale to Reed Elsevier customers.")

discussed later when dealing with Resellers, *Russell* misinterpreted section 2721(c) as allowing the States to "authorize" certain entities to obtain "motor vehicles records" solely to resell them.

*Russell* only stated that **the plaintiff involved in that litigation** must have alleged an impermissible use of the data involved in order to state a claim under the DPPA. The Court did so because it determined that the data was obtained for a proper purpose -- resale.[12]   The *Russell* Court never held that an obtainment claim can never be stated absent allegations of an impermissible use. That is simply a misreading of *Russell.*

Furthermore, as mentioned above, *Russell* was interpreting a section of the DPPA (section 2721(c)) which has absolutely nothing to do with Convenience Purchasers. Another District Court has examined this specific issue and distinguished *Russell* on this ground. That case was *Parus v. Cator*[13] In *Parus,* the Court stated:

> *Russell* involved a claim against a commercial entity authorized under § 2721(c) to resell personal information for a purpose permitted under § 2721(b). [Defendant] is not (and does not purport to be) an authorized recipient of information under § 2721(c). Rather, he contends that as a law enforcement officer he was permitted to obtain information under § 2721(b)(1).

Just as was the case in *Parus*, Convenience Purchases are not contending that they were allowed to obtain data by Section 2721(c) of the DPPA.   Convenience Purchasers contend that they were allowed to obtain "motor vehicle records" under various provisions of Section 2721(b).   In such a situation, *Parus* instructs:

---

[12] *Russell v. ChoicePoint Services, Inc.*  300 F.Supp.2d 450, 455 (E.D.La.2004)("Finally, the Court agrees with defendant ChoicePoint that *plaintiff* may not maintain a DPPA claim for improper obtainment under 18 U.S.C. § 2724(a) without alleging an accompanying impermissible use. The plain language of the DPPA permits entities like ChoicePoint to obtain drivers' personal information from DMVs and subsequently resell that information to third parties with a permissible use.")(emphasis added).
[13] 2005 WL 2240955, at 5 (W.D.Wis. 2005)

Because [defendant] was not presumptively authorized to obtain plaintiff's information, there is no reason to require plaintiff to make an additional showing that [defendant] improperly used the information he obtained from the Department of Motor Vehicles database. ***The Russell court's requirement that a plaintiff allege both "improper obtainment" and "impermissible use" is relevant only in the context of a claim arising under § 2721(c). This is not such a case, and therefore Russell is not applicable.***[14]

The Court in *Parus* incorrectly noted that "[t]he statute uses the disjunctive "or" to connect the terms "obtains," "discloses" and "uses." Therefore, each term must be given a separate meaning."[15]    Finally, the Court held that "[s]ection 2724(a) makes a person liable when he knowingly obtains personal information from a motor vehicle record for a purpose not permitted under the Act ***regardless whether he proceeds to disclose or use the information***."[16]

As the *Parus* court instructs, there is clearly no requirement under the DPPA that one allege an impermissible use of "motor vehicle records" to present a civil obtainment claim.  Use is only required in the section describing criminal acts.[17]  For civil liability, one only need assert an impermissible purpose, not an impermissible use.  This Court should reject Convenience Purchasers' opportunistic reading of *Russell*.  By the clear terms of the Act, one violates the DPPA by obtaining data for any *purpose* "not permitted under [the DPPA]," regardless of whether that person proceeds to wrongfully use the information or not.  One dictionary definition of "purpose" is "the reason for which something exists or is done."  Thus, Congress sought to prohibit obtainment of data for a reason other than the permissible reasons allowed by the Act.  The permitted purposes for

---

[14] *See id.* at *5.
[15] *See id.* at *5.
[16] *See id.* (emphasis added).
[17] 18 U.S.C. §2722 ("It shall be unlawful for any person knowingly to ***obtain*** or disclose personal information, from a motor vehicle record, ***for any use*** not permitted under section 2721(b) of this title.

obtaining data are the uses delineated under §2721(b). A person is allowed to obtain an individual's "motor vehicle record" if he or she has a proper use for that particular piece of information. Any other purpose or reason a defendant has for obtaining an individual's "motor vehicle record" other than to use it in accordance with the DPPA violates that Act. Hence, Plaintiffs' assertions that any purpose Convenience Purchasers had for obtaining Plaintiffs' individual motor vehicle records", other than the use of that *particular piece* of "personal information" is in violation of the DPPA.

Convenience Purchasers have simply obtained more individual "motor vehicle records" than they needed for their asserted purpose. For example, a number of Defendants contend that millions of persons' "motor vehicle records" were obtained to verify customer information. However, those Convenience Purchasers have no customer relationship with the Plaintiffs identified. How can these Convenience Purchasers possibly contend that their purpose for obtaining the "motor vehicle record" of an individual it has never had a customer relationship with was to verify information submitted by a customer? Similar arguments can be made for each asserted "purpose."

In their Statement[18] recently filed with the Court, Plaintiffs assert that Convenience Purchasers had no permissible purpose for obtaining their particular, individual, personal information. Plaintiffs further stated that [Convenience Purchasers] obtained Plaintiffs' "personal information" for an impermissible purpose – to save itself time and/or money by not having to go back to the State of Texas each time it needs additional information, to avoid the inconvenience of having to go to the State each time it needs an additional customers' information (as many other entities do on a regular basis.)." Plaintiffs further stated that most defendants "continued to use Plaintiffs'

---

[18] *See* Document 62.

personal information by maintaining a database containing the above-referenced Plaintiffs' personal information as part and parcel to the conduct of its ordinary business activities and as a business resource."

These statements clearly state a cause of action under the DPPA. "Any purpose Convenience Purchasers had for obtaining the above-referenced Plaintiffs' 'personal information' other than an immediately contemplated use (which simply means "current use")[19] of the information for one of the DPPA's authorized uses for the information constitutes a violation of the DPPA." Rather than verify information on a case-by-case basis as contemplated by the DPPA, Convenience Purchasers chose to simply obtain the entire database, containing the personal information of over twenty million individuals. This choice to violate the law is the basis for Plaintiffs' improper obtainment claims.

Numerous Convenience Purchases go to great lengths to explain how "impractical" it would be to have to return to the State each time it needs an additional piece of information and that, based on this, Congress could never have intended for those business to have to jump through that hurdle. Interestingly, Convenience Purchasers provide the example of a tow truck operator and contend that Congress could not have intended for a tow truck operator to go back to the State each time it needs additional "motor vehicle records." Apparently, all a would-be stalker or murderer need do to obtain "personal information" on over twenty million people is buy a tow truck. Then he would be perfectly justified in obtaining the states' entire database of "motor vehicle records."

---

[19] *Pichler v. UNITE* 339 F.Supp.2d 665, 668 (E.D.Pa. 2004)(holding that a union's obtainment of data for use in litigation  required an actual litigation or an actual investigation in anticipation of  a specifically identifiable litigation.). In *Pichler* the Defendant was not allowed to rely on the fact that it was often in litigation and therefore might likely need the information in the future for litigation purposes.

11

Therein lies the problem with Convenience Purchasers' argument. It completely ignores the legislative history bemoaning how readily available persons' drivers license records are. Congress clearly sought to curb the states' wholesale selling of drivers records. In fact, of all of the legislative history presented by Convenience Purchasers, not one Senator states that the DPPA will allow companies to continue to purchase states' entire databases. Under Convenience Purchasers strained reading of the DPPA, all a person has to do to obtain drivers license records is come up with an asserted use for one single record and claim they might need the remainder of the database later for the same purpose. This is clearly not what the DPPA contemplates. A person or entity must have a permissible purpose for each individual "motor vehicle record" it obtains.

Nor should Congressional intent should be surmised solely because of a particular piece of legislation's impact upon the business it regulates. Convenience Purchasers chose their businesses. There are all sorts of statutes that make running a business more costly or, in some cases impractical. Simply put, business necessity is not an authorized purpose for obtaining personal information for motor vehicles records.

Convenience Purchases also attempt to play games by making such statements as "Plaintiffs' factual allegations are that Defendants obtained data for a permissible purpose under the DPPA, but did not immediately use that data." This is nonsense. Plaintiffs could not have been more clear that their core allegations are that Convenience Purchasers obtained millions of pieces of data without a proper purpose for doing so. Convenience Purchasers statements that "Plaintiffs' Statement does not assert that any Defendant lacked one of the permissible purposes in the DPPA's list" is also puzzling. That is precisely the basis of Plaintiffs' claims.

Convenience Purchasers contend that they have a permissible purpose and want this Court to go beyond the pleadings and determine that their asserted permissible purposes preclude relief. This is beyond the scope of a motion to dismiss. If Convenience Purchases wish to present evidence that they had a permissible purpose for obtaining millions of pieces of individual data, and specifically Plaintiffs' data, they should allow discovery to be had on the veracity of those claims and, after appropriate discovery, seek summary judgment.

In fact, the interrogatory recent served on Convenience Purchasers asked them to delineate specifically the exact purpose they had for obtaining Plaintiffs' information and to state the facts upon which they relied in asserting that purpose. Every Convenience Purchaser responded with global assertions and refused to present any fact which would justify their obtaining each Plaintiffs' individual "motor vehicle record." The fact is that Convenience Purchasers had no use for the vast majority of the information they obtained, including Plaintiffs "personal information." This violates the DPPA.

Finally, the fact that states, including the State of Texas have apparently interpreted the DPPA as allowing this procedure (which is actually doubtful given the language of the disclaimers in the Contract as well as the airtight indemnity clause protecting the State from lawsuits for violating the DPPA) should not be surprising. States make millions of dollars selling this information. Just because the State of Texas is apparently willing to look the other way as long as it is indemnified should not carry much weight in interpreting the DPPA. Of course the State of Texas wants to keep selling this information in bulk.

It is clear that Plaintiffs have alleged a cause of action against Convenience Purchasers for not having a permissible purpose to obtain their specific individual "motor vehicle records" which contained their individual "personal information." This conclusion is based on a close inspection of the DPPA and its clear meaning. For this reason, Plaintiffs request that Convenience Purchasers Motion to Dismiss be denied.

**D. The *Russell* Court Incorrectly Interpreted The DPPA As To Resellers.**

Despite their earlier mischaracterizations of *Russell*, Resellers are correct that *Russell* concluded that the DPPA allows an entity to obtain drivers license data solely for the purpose of reselling that data to others. In doing so, the Court first focused on a specific provision of the DPPA regarding resale of data. Section 2721(c) provides:

> **Resale or redisclosure.**-An authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or redisclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b)(11) or (12)). An authorized recipient under subsection (b)(11) may resell or redisclose personal information for any purpose. An authorized recipient under subsection (b)(12) may resell or redisclose personal information pursuant to subsection (b)(12). Any authorized recipient (except a recipient under subsection (b)(11)) that resells or rediscloses personal information covered by this chapter must keep for a period of 5 years records identifying each person or entity that receives information and the permitted purpose for which the information will be used and must make such records available to the motor vehicle department upon request. (emphasis added).

The *Russell* court focused on the term "authorized recipient." The defendants in *Russell* had argued that the State of Louisiana had "authorized" them to resell data and thus, they had obtained the data for a permissible purpose – to resell it. The plaintiff, on the other hand, had argued that the term authorized recipient meant one who was

authorized by the DPPA to receive the data, *i.e.* someone who had a permissible purpose for obtaining the data.  The court noted that the term "authorized recipient" is not defined by the DPPA and concluded that the Act must be referring to some undefined state authorization process:

> The term "authorized" is defined as "marked by authority ... [or] sanctioned by authority" *Webster's Third New International Dictionary*. "Authorize" means "to endorse, empower, justify, or permit by or as if by some recognized or proper authority" or "[t]o give permission for ... [or to] sanction." *Webster's Third New International Dictionary; The American Heritage Dictionary*. The *American Heritage Dictionary* supplements the above definition of "authorize" with the following example of its usage: "city agency that authorizes construction projects." (emphasis omitted). The definitions of "authorize" and "authorized" ***make clear that the terms are commonly used in reference to a grant of permission by a state or municipal agency.*** This common usage would apply to a DMV resale authorization just as it would a city council construction authorization. It is doubtful that Congress employed the term "authorized" to refer to the DPPA directly sanctioning a recipient because the Act otherwise speaks in terms of "use" rather than "user" and provides no process or guidelines for authorization. More likely, Congress intended to leave the recipient authorization process to the states. (emphasis added).

If we examine closely the court's analysis, however, a glaring problem becomes apparent.  First, the court notes that authorized means "marked by authority . . . [or] sanctioned by authority.  Plaintiffs do not dispute this.  The court next notes an example of usage for authorized – "city agency that authorizes construction projects."  Plaintiffs agree that this is *one* common use for authorized, but hardly the only one. From here, the court makes an enormous leap and concludes that Congress could have only been referring to some undefined, unspecified state authorization process. The court jumped to this conclusion despite other language in Section 2271(c), which clearly demonstrates

that the term "authorized recipient" refers to persons who were authorized by the DPPA to obtain the drivers license records in the first place.    Statutes commonly "authorize" actions and the DPPA is no different.    Take, for example, a few phrases of Section 2721(c) which illustrate this point:

> An ***authorized recipient . . . (except a recipient under subsection (b)(11) or (12))*** may resell or resdisclose . . .

> An ***authorized recipient under subsection (b)(11)*** may resell or redisclose . . .

> An ***authorized recipient under subsection (b)(12)*** may resell or redisclose personal information pursuant to subsection (b)(12).

> Any ***authorized recipient (except a recipient under subsection (b)(11))*** that resells or rediscloses . . .
> (emphasis added).

In four separate instances in a single paragraph, the DPPA makes reference to a person being an authorized recipient ***under*** a specific provision of the DPPA.  One could not ask for a clearer statement of the meaning of authorized recipient.

Thus, Section 2271 (c) simply states that persons who are allowed to receive drivers license records under the DPPA are allowed to sell those records, so long as they make sure that the vendees of the data are themselves obtaining the data for a proper purpose.  The *Russell* court's reading of Section 2271(c) as creating or recognizing a right to purchase drivers license records solely for the purpose of resale is a pretty tortured reading of Section 2271(c).  When one steps back and examines the statute as part of a comprehensive whole, its meaning because perfectly clear.

In fact, when the United States Supreme Court initially reviewed the DPPA, Justice Rehnquist, speaking for a unanimous Court, albeit in *dicta*, read the act exactly as Plaintiffs do:

16

the Act allows private persons who have obtained drivers'
personal information *for one of the aforementioned
permissible purposes* to further disclose that information
for any one of those purposes. Ibid. If a State has obtained
drivers' consent to disclose their personal information to
private persons generally and a private person has obtained
that information, the private person may redisclose the
information for any purpose. Ibid. *Additionally, a private
actor who has obtained drivers' information from DMV
records specifically for direct-marketing purposes may
resell that information for other direct-marketing uses,
but not otherwise. Ibid...*[20]"

Granted, the above quote is *dicta*. However, it is persuasive *dicta*. The United

States Supreme Court looked at the plain language of the Act and reached the exact same

conclusion Plaintiffs contend. One could not ask for a better example of plain

interpretation of a statute. Justice Rehnquist thought it clear what section 2721(c) meant

– and he never referred to an extra-statutory, state authorization process.

The Iowa Supreme Court, in a detailed analysis, also concluded that the DPPA

does not allow entities to obtain motor vehicle records for resale. The Iowa Court noted

that the DPPA "imposed a gate keeping function on the state departments of motor

vehicles."[21]

The language of the DPPA as a whole makes it plain that
Congress. . . sought limited access to personal information
in state motor vehicle records by both protecting citizens
from the improper use of such information, while allowing
access for legitimate purposes or uses. At the same time, it
imposed a gate keeping function on the state departments
of motor vehicles to exercise discretion to disclose personal
information when used for the purposes described in
subsection (b). *We think this approach taken by Congress
to the dissemination of personal information in motor
vehicle records contemplates that the person or entity
requesting disclosure of the personal information also be
the person or entity that will use the information for the*

---

[20] *Id.* at 146. (emphasis added).
[21] *Locate.Pius.Com. Inc. v. Iowa D.O.T,* 650 N.W.2d 609,616 (Iowa 2002).

17

> *statutory purpose.* Thus, non-consensual disclosure of information is permitted only for approved uses, and disclosure is not permitted if the requester is not seeking to use the information for the statutory purpose. [22]

The Iowa Supreme Court then held that a private reseller "must itself be an 'authorized user'" to be permitted access to DMV records.[23] The Iowa Supreme Court's conclusion is bolstered by well-established rules of statutory construction – that the DPPA must be interpreted "as a symmetrical and coherent regulatory scheme,"[24] and "fit, if possible, all parts into an harmonious whole,"[25] and that the statute's words "must be read in their context and with a view to their place in the overall statutory scheme."[26] In other words, the Court "should not confine itself to examining a particular statutory provision in isolation. The meaning--or ambiguity--of certain words or phrases may only become evident when placed in context." [27]

*LocatePlus.com*[28] represented the collective opinion of seven justices of the highest court of the State of Iowa.  No justice dissented. Nor did any procedural infirmity render this opinion suspect, as has been suggested by Resellers.  The Iowa Supreme Court was faced with the specific question of whether the DPPA allows a person to obtain drivers' license data from a state for the sole purpose of resale.    The Court concluded that it does not.  Again, one cannot reach a conclusion more directly on point.  It should be noted that *LocatePlus.com* (the Reseller) lost its argument at every level at

---

[22] *Id.* (emphasis added).

[23] *Id.*

[24] *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569 (1995).

[25] *FTC v. lvandel Brothers, Inc.,* 359 U.S. 385, 389 (1959)

[26] *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989).

[27]*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000); Brown v. Gardner, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context").

[28]Incidentally, Locate.Plus.com is a Defendant in this action and has joined in Defendants' Consolidated Motion to Dismiss presenting the same claims it lost before the Iowa Supreme Court.

which it was presented at the Iowa Department of Transportation, the trial court, and, finally, the Iowa Supreme Court.

It is in this light that one must view Resellers' presentation of the 1998 Department of Justice memo interpreting the DPPA to allow entities like Resellers to obtain information for resale to others with permissible uses. The so-called "interpretation" that Resellers rely upon was a private opinion letter, <u>not</u> a regulation. Nor was the Department of Justice interpreting a regulation that it had promulgated after "a formal adjudication or notice-and-comment rulemaking."[29] Congress does not generally expect agencies to make law through general counsel opinion letters.[30] Based on the carefully considered opinion of the Iowa Supreme Court and the language of the DPPA itself, this opinion letter should be given little, if any, weight.

Resellers also point to the fact that state governments allow this type of disclosure. As discussed above, it should come as no surprise that state governments

---

[29] *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

[30] *See id.* ("Interpretations such as those in opinion letters--like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law do not warrant Chevron-style deference...; opinion letters ... lack the force of law")(emphasis added; citing *Chevron U.S.A. Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984); *Himmermann v. First Union Mortgage Corp.*, 305 F.3d 1257, 1262 (11th Cir. 2002) ("Letters from RUD's general counsel to members of Congress ... are the kinds of policy positions that lack the force of law and are unentitled to *Chevron* deference"; *Moore v. Ap*fel, 216 F.3d 864, 869 & n. 2 (9th Cir. 2000) (declining to apply *Chevron* deference to Social Security Commissioner's RALLEX Manual, citing *Christensen*); *United States v. Navarro*, 160 F 3d 1254, 1257 n. 4 (9th Cir.1998) (noting that Department of Justice's Manual for United States Attorneys does not affect statutory analysis); *Am. Express Co. v. United States*, 262 F.3d 1376, 1382 (Fed.Cir.2001) ("[An] interpretation ... contained in [a] General Counsel Memorandum ... [that] is not reflected in a regulation adopted after notice and comment probably would not be entitled to *Chevron* deference."). As noted recently in *Air Brake Systems, Inc. v. Mineta*, 357 F.3d 632,635 (6th Cir. 2004):

> In this case, the Department of Justice emphatically denies that the opinion letters issued by NHTSA's Chief Counsel are authoritative views entitled to any deference. ...We accept the Government's acknowledgment that the opinion letters here are not entitled to any deference in the federal courts--whether under *Chevron* or *Seminole* Rock--and thus do not have legal consequences. Having no direct, binding effect on Air Brake and having no legal consequences for Air Brake by virtue of the deference courts might give to them, the Chief Counsel's letters are not "final" agency action under the APA.

might enact regulations contrary to the DPPA.  In fact, it was the states' behavior and economic incentives for selling drivers' data that the DPPA sought to curb.

Resellers position and the Plaintiffs' position present starkly different views of this statute – but only one of them is consistent with its history and its purpose.  In Resellers view, the statute allows giant corporate middlemen the unlicensed freedom not only to obtain drivers' information without themselves using it, but to obtain, index, repackage, reorganize, and disseminate that information at will.  In Reseller's vision, both the state and the driver remain entirely absent from this process, until the information reaches some purchaser which itself intends to make some use of the information, and only then is the purchaser required to comply with the statute by making only a permitted use, which includes securing the drivers' consent if that intended use is bulk distribution.

In contrast, Plaintiffs' vision, consistent with the language, history and purpose of this statute, is to exercise some primary control at the outset over these massive middle men. The entire purpose of this statute is to rein in the information merchants, and to limit the acquisition of private information to companies and individuals who actually intend to use it for a permitted purpose. Only in that way can the State perform its gatekeeper function of screening the ultimate users of this product. Only in that way can the information merchants be regulated. Of these two competing visions, one of them blasts a loophole into this statutory scheme. The other is faithful to its purpose. For these reasons, Plaintiffs ask that the Court deny Resellers' Motion to Dismiss.

## E.  Even if *Russell* is Correct, The State of Texas Has No Resale Authorization Process

*Assuming* that Defendants and the *Russell* court are right, let us also assume that Congress's use of the term "authorized recipient" meant that Congress chose to leave it

up to the States to develop some authorization process by which to allow companies to obtain drivers license records solely to resell.   What exactly did Congress mean by granting the states such authority?  Let us look again at the supposed grant of authority to the states:  "An authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or redisclose the information only for a use permitted under subsection (b)."

First, this supposed grant of authority is clearly written as a restriction upon the recipient's ability to resell the data in question.  Congress simply limited the persons to whom an "authorized recipients" can sell the data – to one who intends to use the data for an enumerated purpose.   The statute does not say "a State may authorize certain individuals to obtain data for resale and those entities may resell or re-disclose the information only for a use permitted under subsection (b)."  But yet, that is how the *Russell* Court interprets this phrase.  So again, we are left to determine what Congress meant by these words.

As discussed above, Resellers and the *Russell* court reject the notion that "authorized recipient" means a recipient who was authorized *by the DPPA* to receive drivers license data.  Both insist that this provision refers to a grant of authority by a State or one of its agencies.  But it would not make sense for the this provision to refer to a situation where a State has simply ensured that a recipient has obtained the drivers license data in accordance with the DPPA – *i.e.,* where a state merely requires that a recipient certify that it itself will use the data in accordance with the DPPA.  If this were the case, this provision would have no meaning separate from the meaning presented by Plaintiffs. No, according to *Russell,* this provision refers to a state granting authority upon a person

21

to obtain the data solely to resell it, presumably by examining certain recipients and deciding which ones are sufficiently trustworthy to purchase data solely to resell it to others.[31]

Interestingly, Resellers stop short of asserting that they are "authorized recipients."[32] They merely noted that the "Texas DPS has determined that it may sell driver information in bulk to purchasers *that certify a permissible intended use.*"[33] There is a very good reason why Defendants have shied away from the assertion that they are "authorized recipients." *The State of Texas has no process to "authorize" entities to obtain drivers license data solely for resale.* A close examination of the Contract at issue in this lawsuit reveals that it does nothing more than verify that the recipient itself has a proper use for the records obtained.[34] At the bottom of the first page lies the following language: "Purchaser further certifies *that his/her/its use* of the record and information purchased under this contract is for the following permissible purpose(s) and for no others:" Thus, the State of Texas sells information to entities which certify that its own use of the information will be for an enumerated use under the DPPA.

It is true that later the Contract acknowledges that, pursuant to the DPPA, once an entity has obtained motor vehicle data for a permissible use, it is then allowed to resell that data to another permissible user. However, the State of Texas' Contract does not allow anyone to obtain the database solely to resell it. Under the Contract, the purchaser

---

[31] *Russell v. ChoicePoint Services, Inc.* 300 F.Supp.2d 450, 457 (E.D. La. 2004)("The inclusion of the term "authorized recipient" and the exclusion of any reference to "users" in DPPA § 2721(c) indicates an intent on behalf of Congress to delegate authorization to the states and thereby permit personal information resellers like ChoicePoint who are authorized by the state or its DMV *to obtain drivers' personal information for the purpose of redistribution* to persons with 'permissible uses.'")

[32] *See* Consolidated motion to Dismiss at 19  "Pursuant to that authority, the Texas DPS has determined that it may sell driver information in bulk to purchasers that certify a permissible intended use."

[33] *See* Exhibit 2.

[34] *See id.*

is required to certify that it will use the data itself for one of the listed purposes. The purchaser is required to initial a line beside each use that *it* has for the data. There is nowhere for purchasers to assert that they are obtaining the database solely for resale. It appears that the State of Texas would not sell the database if each line was left blank and, in fact, every reseller actually certified that it had its own *use* for the records  Thus, the State of Texas merely authorizes entities to obtain data for their own use and then resell it, which would be in accordance with the DPPA. Thus, even if *Russell* is correct that the states can authorize recipients to obtain "motor vehicle records" for the sole purpose of resale, that is not what the State of Texas has done here. Resellers have no argument that they are "authorized recipients," and hence no justification for obtaining the Texas' database for resale.

F. **Plaintiffs have Standing to Assert Their Claims**

Defendants cite *Lujan v. Defenders of Wildlife*[35] for the proposition that a plaintiff must demonstrate a concrete injury in order to demonstrate standing. Defendants, however, clearly misread *Lujan* to the extent they assert that violation of the DPPA does not confer standing. The court in *Lujan* states that "the plaintiff must have suffered an "injury in fact"-*an invasion of a legally protected interest*."[36] *Lujan* makes clear that the concern is with violation of a legally protected interest – that is the injury required. In this case, Congress clearly recognized and created a legally protected right to not have one's personal information obtained without the requisite permissible purpose. The violation of that right is the concrete injury necessary to confer standing.[37] According the

---

[35] 504 U.S. 555, 560 (1992).
[36] *Id.* at 560 (emphasis added).
[37] *Parus v. Cator* 2005 WL 2240955, at 5 (W.D.Wis. 2005)("It is true that plaintiff has not alleged that he suffered injury as a result of defendant Kreitlow's obtaining his personal information. However,

United States Supreme Court, injury can be found in the invasion of any interest that Congress has elevated to the status of an individual "legal right."[38]  Thus, it is well-established that an actual or threatened injury sufficient to meet Article III case-or-controversy "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing."[39] To some degree, Congress may define an injury, for case-or-controversy purposes, where one may not have existed under the common law.[40]  In *Federal Election Comm. v. Akins*,[41] for instance, the Supreme Court found that the Federal Election Campaign Act created a right to information and, consequently, found an injury sufficient for standing where the FEC allegedly failed to obtain and produce information in violation of the Act. The injury was to the right to obtain (via the FEC) financial information from a politically active private organization, a right solely secured by statute.[42]

Whether Plaintiffs seek actual damages in their Complaint is irrelevant.  Plaintiffs have alleged that their legally protected interests have been violated and that they are entitled to relief from this Court, which includes injunctive relief and punitive and liquidated damages.  The Eleventh Circuit Court of Appeals has unequivocally held that a

---

under the statute, improperly obtaining plaintiff's information was an injury. The Driver's Privacy Protection Act is designed to safeguard personal information. See, e.g., 139 Cong. Rec. S15765 (1993) ("Easy access to personal information makes every driver in this nation vulnerable and infringes on their right to privacy.") (statement of Sen. Robb). If defendant Kreitlow obtained plaintiff's information in violation of the law, then he infringed upon plaintiff's privacy.").

[38] *See Linda R.S. v. Richard D.* 410 U.S. 614, 617 n.3  (1973). ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.").

[39] *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (citations and internal quotation marks omitted).

[40] *See Lujan*, 504 U.S. at 580 (Kennedy, J., concurring).

[41] 524 U.S. 11, 20-22 (1998).

[42] *See id.*

24

plaintiff need not establish actual monetary damages to be entitled to liquidated damages under the DPPA.[43] Thus, Plaintiffs clearly have standing to pursue their claims.

The DPPA prohibits improper *obtainment* as well as improper *use*. *Russell* held that a resale was a permissible reason for *obtaining* drivers license data under the DPPA.[44] As discussed above, this interpretation was directly contrary to the Iowa Supreme Court's interpretation.    Regardless, because the Court in *Russell* determined that *obtainment* for resale was permissible, it held that the plaintiffs must allege some improper *use* to demonstrate a violation of the statute. Because the Court concluded that no such use was demonstrated, it held that Plaintiff's legally protected interests were not violated. Thus, Plaintiffs did not have standing. Thus, this court's determination as to whether there is standing directly depended on whether the facts alleged rose to a violation of the statute. *Russell,* thus, does not impose any greater pleading standard to establish standing than simply requiring a showing that the statute was in fact violated. If the statute is not being violated as to a particular defendant, that Plaintiff does not have standing to file suit because the statute might be violated in the future. That is all that *Russell* stands for.

Whether the facts asserted by Plaintiff are sufficient to state a cause of action – they are – has been fully presented to the court for its determination. There can be no doubt, however, despite Defendants' characterization of *Russell*, that a Plaintiff whose information is wrongfully obtained has standing to redress that violation of his or her legally protected interest in this court. Plaintiffs have alleged that their information was obtained without the requisite statutory purpose. As is discussed below, this is sufficient

---

[43] *Kehoe v. Fidelity Federal Bank & Trust,* 421 F.3d 1209 (11th Cir. 2005).
[44] 302 F.Supp.2d 654 (E.D.La. 2004).

to state a cause of action and clearly confers standing on Plaintiffs to redress that violation of their legally protected interest in this Court. As the violation of this legally protected interest has already occurred, this matter is ripe for the Court's consideration.

Respectfully submitted,

**THE COREA FIRM, P.L.L.C.**


/Jeremy R. Wilson/
Thomas M. Corea
Texas Bar No. 24037906
Jeremy R. Wilson
Texas Bar No. 24037722
The Republic Center
325 North St. Paul Street, Suite 4150
Dallas, Texas 75201
Telephone:    (214)953-3900
Facsimile:    (214)953-3901

**OTSTOTT & JAMISON, P.C.**
George A. Otstott
Texas Bar No. 15342000
Ann Jamison
Texas Bar No. 00798278
Two Energy Square
4849 Greenville Avenue, Suite 1620
Dallas, Texas 75206
Telephone:    (214)522-9999
Facsimile:    (214)828-4388

**THE MANN FIRM**
James Mark Mann
Texas Bar No. 12926150
300 W. Main
Henderson, TX 75652
(903) 657-8540
Fax: (903) 657-6003

26

## CERTIFICATE OF SERVICE

I certify that on May 9th, 2008, I electronically filed the above Motion with the Clerk of the Court using CM/ECF and that the Motion has been forwarded by CM/ECF to all counsel of record.

/Jeremy R. Wilson/

Jeremy R. Wilson