IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SHARON TAYLOR, et al., | § § § | **CAUSE NO. 2:07-CV-00001** |
| Plaintiffs, | § § § | CONSOLIDATED FROM |
| v. | § § | CAUSE NO. 2:07-cv-000017 |
| SAFEWAY, INC., et al. | § § § | |
| Defendants. | § § § | JUDGE: Donald D. Walter *By Assignment* |

## **DEFENDANT ASL'S SUPPLEMENT TO DEFENDANTS' CONSOLIDATED REPLY**

It is important to place into perspective what is the heart of Plaintiffs' case. Plaintiffs are seeking $50 billion in damages from ASL while at the same time failing to allege or have an injury of any kind. As disclosed in its Interrogatory Response, ASL legally obtained motor vehicle records for possible resale for the permitted purpose of marketing and solicitation at a time when the DPPA required Texas drivers to expressly "opt out". No Plaintiff alleges that he or she opted out or received any unwanted solicitation as a result of ASL's purchase of Texas motor vehicle records, much less that the receipt of such a solicitation caused any injury.

Plaintiffs should not be allowed to shift the Court's focus from the flaws in their case.[1] This case must be dismissed as set forth in the Consolidated Response, the Consolidated Reply, and ASL's Supplemental Response. ASL writes separately here to address a few issues raised in Plaintiffs' specific response to ASL's Supplemental Response.

---

[1] ASL incorporates all of the arguments made in its Motion for Judgment on the Pleadings, filed February 19, 2008, Defendants' Consolidated Motion to Dismiss on Common Issues and Response to Plaintiffs' Statement of Violations ("Consolidated Response"), filed April 18, 2008, ASL's Supplement to Defendants' Consolidated Response (ASL's "Supplemental Response"), filed April 21, 2008, and Defendants' Consolidated Reply, filed on May 14, 2008.

72457.000001 EMF_US 25728227v1

A.  **Plaintiffs Fail to State an Obtainment Claim Because ASL Never Obtained Information After the Effective Date of the 1999 Amendment.**

Plaintiffs' case against ASL is premised on the wrong effective date of the 1999 amendment to the DPPA. ASL last obtained motor vehicle records from Texas ***prior to*** the effective date in Texas of the 1999 amendment. Under the 1999 amendment, a State could only sell information for marketing and solicitation purposes if the State had obtained the "express consent of the person to whom such personal information pertains." 18 U.S.C. 2721 (b)(12). Prior to the effective date of the 1999 amendment, a State could sell such information if the State gave persons the opportunity to prohibit such sales, or to "opt out." *Reno v. Condon*, 528 U.S. 666, 669 (2000). Here, since no Plaintiff has alleged that he or she opted out, Plaintiffs cannot state an obtainment claim against ASL. Thus, ASL was permitted to obtain, disclose, and use the data it lawfully acquired.

The 1999 amendment provides that the changes to 18 U.S.C. § 2721(b)(12) "shall be effective on June 1, 2000, excluding the States of Arkansas, Montana, Nevada, North Dakota, Oregon, and Texas that shall be in compliance . . . within 90 days of the next convening of the State legislature." Pub. L. 106-69 § 350(g), 113 Stat. 986, 1025-26 (1999). As ASL explained in its Supplemental Response, that date, in Texas, was on or about April 2001.

Realizing that ASL last obtained motor vehicle records from Texas prior to April 2001, Plaintiffs adopt a strained construction of the statutory language and now claim that the "grace period" only applied to the State, not to those who purchase information from the State. Plaintiffs cite no authority for this argument, and it makes no sense. The entire focus of the 1999 amendment was on requiring action from the States since, obviously, only the States could obtain consent for release of the information. *See* Pub. L. 106-69 § 350(g), 113 Stat. 986, 1025 (1999) ("18 U.S.C. 2721(b)(12) is amended by . . . inserting the following: '***if the State*** has obtained the

express consent of the person to whom such personal information pertains.'"). And Congress recognized that States would need time to implement "opt in" procedures. Accordingly, Congress delayed the effective date nine months to allow them time to do so. Until then, the prior law remained in effect, and information could legally be purchased and sold unless the person to whom the information pertained had opted out. 145 Cong. Rec. S11863 (daily ed. Oct. 4, 1999) (statement of Sen. Shelby) ("We recognize that states may need time to comply with this provision. And we've proposed to delay the effective date nine months.").

But six states, including Texas, have legislatures that only meet biennially. *See* Nat'l Conference of State Legislatures, http://www.ncsl.org/Programs/legismgt/about/sesshistory.htm. Recognizing that those states would need more than nine months to comply, Congress gave them a period of time after the convening of their next legislatures to implement the procedures that would allow them to determine whose information could be sold and used. There is nothing in the language of the amendment or its legislative history that remotely suggests a separate effective date for private parties, and it is ludicrous to suggest, as Plaintiffs do, that Texas could legally sell motor vehicle records for marketing purposes until April 2001, but that no one could legally purchase them for that purpose or that private purchasers could only obtain or use information that had been subjected to an opt-in procedure that Texas had neither the opportunity nor the legal requirement to implement. Nor does the 1999 amendment or its legislative history contain an indication that Congress intended to implement a ban on marketing activities in States that had effective dates later than June 2000. If that were the case, why would Congress not simply have removed section (b)(12) from the statute? The clear meaning of § 350(g) is that Texas could continue to operate under the prior provision until it had the opportunity to

implement appropriate procedures. There is no merit to Plaintiffs' argument that Congress intended to have 2 separate effective dates for the 1999 amendment.

B. **Plaintiffs Fail to State an Improper Use Claim Under the DPPA.**

ASL also pointed out in its Supplemental Response that Plaintiffs' late attempt to plead a use claim was speculative at best and unsupported by any pleaded facts. Plaintiffs respond with still more unwarranted conclusions: "it is reasonable to assume that this Defendant used that database after the effective date of the DPPA," and ASL "likely used the database for solicitation and/or marketing." Response at 5. These statements are, again, improper speculation, and unpleaded speculation at that. It is Plaintiffs' burden to plead and prove that obtainment or use was for a purpose not permitted by the DPPA. *Thomas v. Hartz*, No. 06-16158, 2008 WL 1821238 at *4 (11th Cir. Apr. 24, 2008). Their Statement only pleads that "it is fair to conclude" that ASL has "maintained" their information "as a business resource." Statement at 50. It is "axiomatic" that a pleading cannot be amended by a brief in opposition to a motion to dismiss. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1985).

Moreover, Plaintiffs must allege more than otherwise lawful activity to hale ASL into court and subject it to onerous and expensive litigation. Plaintiffs speculate that ASL used data after the effective date because it ***lawfully obtained*** the data before the effective date. This Court, however, required Plaintiffs to state specific facts supporting claims against ASL. Despite the opportunity to allege additional facts, no Plaintiff has alleged receipt of even one piece of junk mail attributable to ASL or any other fact that might justify a finding of improper use by ASL.[2] Plaintiffs in effect presume that anyone who ever obtained DMV records is subject to liability for

---

[2] ASL does not suggest or concede that the receipt of junk mail is a sufficient harm or injury to justify the imposition of billions of dollars of damages. *Cf. Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 72 (1983) ("[T]he short, though regular, journey from mail box to trash can . . . is an acceptable burden." (alteration in original)). But Plaintiffs' failure to allege supporting facts merely underscores the inadequacy of Plaintiffs' pleading against ASL under *Thomas*.

improper use unless and until the purchaser proves after discovery that it no longer has the data or has a permissible purpose. Congress did not intend to impose such a burden. *Thomas*, 2008 WL 1821238 at *4. Without a specific allegation that ASL improperly used a particular Plaintiff's information and that Plaintiff was injured as a result of such use, no Plaintiff has standing.

C.  **ASL Is Clearly Entitled to Use Pre-Amendment Data After the Effective Date.**

Plaintiffs further err by suggesting that Congress intended the 1999 amendment to bar direct marketers from using DMV records obtained before the effective date. Nothing in the 1999 amendment or its legislative history addresses the conduct of authorized recipients; the amendment only changes the procedure required for States to sell data to direct marketers. Moreover, the legislative history of the 1999 Amendment makes clear that Congress was focused on State process, not authorized recipients. *E.g.*, 145 Cong. Rec. S11863 (daily ed. Oct. 4, 1999) (statement of Sen. Shelby) (acknowledging the impact of the 1999 amendment on States and "recogniz[ing] that states may need time to comply with this provision"). Furthermore, to the extent legislative history provides insight on whether authorized recipients may continue to use pre-amendment records, Congress expressly stated that despite the change in a State's process from opt-out to opt-in, "[i]t is the conferees' intent that personal information, such as name, address, and telephone number, can still be distributed as specified by the Drivers' Privacy Protection Act and this Act." H.R. Rep. No. 106-335 at 121 (1999) (Conf. Rep.). This shows that Congress was not intending to retroactively bar the resale for marketing purposes of data already obtained from the State.

The retroactive effect sought by Plaintiffs is strongly disfavored under basic principles of statutory construction. The Supreme Court defines a retroactive statute as a law "tak[ing] away or impair[ing] vested rights acquired under existing laws, or creat[ing] a new obligation,

impos[ing] a new duty, or attach[ing] a new disability, in respect to transactions or considerations already past." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 126 S. Ct. 2422, 2428 (2006) (internal quotations omitted and alterations in original). "[I]t has become a rule of general application that a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication." *Id.* (internal quotations omitted). Federal courts apply a two-step analysis for retroactivity. *Id.*; *Vela v. City of Houston*, 276 F.3d 659, 673 (5th Cir. 2001). First, the court determines "whether Congress has expressly prescribed the statute's proper reach." *Fernandez-Vargas*, 126 S. Ct. at 2428; *Vela*, 276 F.3d at 673. If Congress's intent is unclear, the court next analyzes whether the statute would have a disfavored retroactive effect in that it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Vela*, 276 F.3d at 673; *accord Fernandez-Vargas*, 126 S. Ct. at 2428. In this case, the text and legislative history of the 1999 amendment do not demonstrate an "expressly prescribed" reach. Further, if the 1999 amendment were applied retroactively to previously authorized recipients of DMV records, it would certainly impose new liability on past conduct and would have a negative retroactive effect on the settled expectations of recipients such as ASL. The 1999 amendment should not be construed to impose such harsh retroactive effects.

Assuming *arguendo* that the 1999 amendment could be interpreted to bar use of previously released records, courts have long held that a statute capable of two possible constructions should be interpreted to avoid imposing a "great hardship". *E.g.*, *Kreitlein v. Ferger*, 238 U.S. 21, 29 (1915); *Bird v. United States*, 187 U.S. 118, 124 (1902) ("There is a presumption against a construction which would . . . cause grave public injury or even inconvenience"); *Equal Employment Opportunity Commission v. Louisville & N.R. Co.*, 505 F.2d

610, 613 (5th Cir. 1974). Construction of the 1999 amendment to impose a $50 billion liability on ASL for use of lawfully obtained records is an unexpected and great hardship that is avoided by simply focusing on the plain meaning of the statutory language as changing only the States' sale of DMV records going forward.

Nor could Congress have intended such an absurd result as exposing a class of businesses to ruinous liability for activity that it recognized had legitimate value. Congress changed the States' procedure to be more protective of drivers' privacy on a prospective basis, but never questioned the legitimacy of direct marketing. Direct marketing was not an activity that Congress intended to prohibit through the DPPA. Thousands of companies engage in direct marketing, and, as quoted in ASL's Supplemental Response, Congress acknowledged that direct marketing was a permissible business purpose for DMV records.

Direct marketers who lawfully obtained opt-out records should be permitted to retain those records in reasonable reliance on and compliance with the law in effect at the time the records were obtained. Plaintiffs' theory requires this Court to read into the statute a silent requirement, subject to billions of dollars in liability, that ASL purge all prior DMV data because Congress instructed Texas to use an opt-in procedure. And this windfall to Plaintiffs would be based solely on the minor inconvenience of throwing out unwanted mail, which Plaintiffs contend they need not show occurred and have not alleged. The result is strict liability for any direct marketer who obtained DMV records before the 1999 amendment and did not purge the records before the effective date. Nothing in the statute or legislative history supports the implication that, by requiring States to use opt-in, Congress mandated that authorized recipients purge all prior data. It is incomprehensible that the 1999 amendment should be construed to impose such a requirement with consequent catastrophic liability attaching, according to

Plaintiffs, merely on proof that ASL lawfully obtained records before the effective date. Congress clearly did not intend to bankrupt all direct marketers who ever received DMV records.

WHEREFORE, ASL respectfully requests that the Court dismiss this case with prejudice.

Respectfully submitted,

/s/ Stephen S. Maris
Stephen S. Maris
Texas Bar No. 12986400
E-mail:  smaris@hunton.com
Melissa J. Swindle
Texas Bar No. 24013600
E-mail:  mswindle@hunton.com

HUNTON & WILLIAMS LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone:  (214) 468-3300
Facsimile:  (214)  468-3599

**ATTORNEYS FOR DEFENDANT**
**AMERICAN STUDENT LIST, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record who have consented to electronic service through electronic notice provided by the United States District Court for the Eastern District of Texas under E.D. TEX. LOCAL COURT RULE 5(a)(3)(A) on this the 19th day of May 2008. All others were served via certified mail, return receipt requested.

/s/ Stephen S. Maris
Stephen S. Maris